**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| AMERIFORGE CORPORATION (doing business as Coffer Corporation, Forged Vessel Connections, and Texas Metal Works), on behalf of itself and all others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>ULMA PIPING USA CORP. and ULMA FORJA, S.COOP., a/k/a ULMA Advanced Forged Solutions,<br><br>       Defendants. | CASE NO. 4:20-cv-04315<br><br>**JURY DEMANDED** |

## <u>ORIGINAL COMPLAINT</u>

Plaintiff Ameriforge Corporation (doing business as Coffer Corporation, Forged Vessel Connections and Texas Metal Works) ("Ameriforge" or "Plaintiff"), on behalf of itself and all others similarly situated ("the Class"), alleges as follows.

## I.
## INTRODUCTION

1. This is an action for false advertising and unfair competition under federal and Texas state law. Plaintiff and the Class compete with Defendants Ulma Forja, S.Coop. (sometimes doing business as ULMA Advanced Forged Solutions) ("Ulma Forja") and its U.S. subsidiary, Ulma Piping USA Corp. ("Ulma Piping") (together, "Defendants" or "Ulma") in the market for carbon steel flanges. Flanges are critical components used in oil and gas pipelines, as well as in many other applications. Flange integrity and compliance with stated specifications can mean the difference between a well-functioning system and a catastrophic failure. "Normalization" is a heat treatment process that changes the physical composition of carbon steel, making the grains in its

crystalline structure smaller and more uniform. This process relieves stresses in the steel, and makes it more machinable and tougher than in its non-normalized state. Normalized flanges also cost more to make than non-normalized flanges.

2.      For years, Ulma has advertised all of its ASTM A105 carbon steel flanges sold in the U.S. in all pressure classes as "normalized" (i.e. heat treated after forging) and compliant with ASTM heat-treatment standards. In May 2017, two of Ulma's competitors, Boltex Manufacturing Co., L.P. ("Boltex") and Weldbend Corporation ("Weldbend") sued Ulma for false advertising and unfair competition in the United States District Court for the Southern District of Texas, Case No. 4:17-cv-1400 (Hon. Andrew S. Hanen). After two-and-a-half years of litigation, the case went to trial. During trial, Ulma's key executives—including its CEO, Jesus Urien; CFO, Nerea Villar; the head of Ulma's U.S. subsidiary, Iosu Bastida; and Ulma's director of quality control and quality assurance, Peio Errasti—finally admitted under oath that Ulma chose to save the cost of heat treatment by not normalizing its flanges, and that Ulma for decades falsely represented to customers and others in the market that Ulma's non-normalized flanges were "normalized." In fact, at least 95% of the flanges Ulma advertised and sold into the U.S. as normalized and ASTM-compliant flanges were not normalized, and not compliant; indeed they were not heat-treated at all.

3.      The jury in the Boltex and Weldbend suit found against Ulma, concluding that from May 5, 2013 through May 31, 2019, Ulma gained at least $26 million in unjust profits from its false advertising and unfair competition. Judge Hanen agreed with this finding, and held that disgorgement was an appropriate remedy for Ulma's false advertising. However, he reduced the jury's disgorgement award to $5,720,000—about 22% of the full disgorgement award—because Plaintiff and the Class were not represented in the Boltex and Weldbend suit. Judge Hanen explained that "the harm the Lanham Act addresses is one **shared by all competitors in the**

**market**—the encroachment on the ability to compete in a fair market." (emphasis added). Thus, "a disgorgement **award shared between all competitors in the market** may serve the Lanham Act's purpose of achieving equity between or among the parties." (emphasis added, quotations and brackets omitted). But in the Boltex and Weldbend suit, the Court had "only two of the many flange competitors before it." The jury's verdict—and Judge Hanen's judgment—became final and non-appealable on July 8, 2020.

4.      Because Ulma's unjust profit "was gained at the expense of **all competitors in the flange marketplace**," Plaintiff brings this class action on behalf of itself and other injured competitors to seek disgorgement of the 78% of Ulma's unjust enrichment—over $20 million in profits—that Ulma retains.

## II.
## PARTIES

5.      Ameriforge is a technology and manufacturing specialist providing technology, services, and fully-integrated manufacturing capabilities to clients in the United States, and around the world. Based in Houston, Texas, Ameriforge provides products and services to the oil and gas, general industrial, aerospace, and power generation industries, offering a broad range of both highly-engineered and general forged products. Ameriforge's products sold to U.S. customers include high quality, A105 normalized carbon steel flanges.

6.      Defendant Ulma Forja is a flange manufacturing cooperative company, with its principal place of business at Barrio Zubillaga No. 3, Apartado 14 20560 Oñati (Gipuzkoa), Spain. Ulma is a member of the Ulma Group, comprising nine member businesses in various industrial sectors. The Ulma Group in turn is part of Mondragon Corporation, the largest association of cooperative companies in the world. Ulma Forja manufactures and sells a variety of forged products, including carbon steel flanges for the oil and gas, petrochemical, transmission,

engineering, and construction industries. Ulma's carbon steel flanges are sold in the United States and worldwide through various distributors, including but not limited to Ulma Piping.

7.      Defendant Ulma Piping is a corporation organized under Texas law with its principal place of business at 9731 Wortham Blvd., Suite 101, Houston, Texas 77065. Ulma Piping is the North American sales office and representative for Ulma.

### III.
### JURISDICTION AND VENUE

8.      This action arises under Section 43(a) of the Lanham Act, Title 15 of the United States Code, § 1125(a), and common law of unfair competition. This Court has original jurisdiction over the subject matter of this lawsuit under 28 U.S.C. §§ 1331, 1338 and 15 U.S.C. § 1121(a), because it arises under the Lanham Act.

9.      This Court has subject matter jurisdiction over Plaintiff's and the Class's state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of supplemental jurisdiction, because the subject matter is so related to the claims asserted under federal law as to form part of the same case or controversy.

10.     The exercise of personal jurisdiction over Ulma Piping in Texas is proper because it is a corporation organized under Texas law with its principal place of business in Houston, Texas.

11.     The exercise of personal jurisdiction over both Ulma Piping and Ulma Forja in Texas is proper because acts giving rise to Plaintiff's and the Class's causes of action occurred in the State of Texas and more particularly, within the Southern District of Texas. More specifically, Ulma Forja and Ulma Piping market, promote, advertise, offer for sale, sell, and/or distribute their purportedly normalized carbon steel flanges to customers throughout the United States and throughout the State of Texas, including in the Southern District of Texas. Defendants also purposefully and voluntarily placed their purportedly normalized carbon steel flanges into the stream of commerce with the

expectation that they will be purchased by customers throughout the United States and throughout the State of Texas, including in the Southern District of Texas. Defendants purposefully and voluntarily directed false and misleading advertising and promotions throughout the United States and throughout the State of Texas, including in the Southern District of Texas. Customers purchased Ulma's purportedly normalized carbon steel flanges throughout the United States and throughout the State of Texas, including in the Southern District of Texas. Moreover, the Boltex and Weldbend suit against Ulma, Case No. 4:17-cv-1400, which serves to both collaterally and judicially estop Ulma and demonstrates additional contacts with this jurisdiction, was prosecuted in the Southern District of Texas. Ulma did not contest personal jurisdiction in that action and instead asserted counterclaims against both Boltex and Weldbend (all of which were dismissed on summary judgment) and vigorously litigated the merits of the case in this forum.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because a substantial part of these events or omissions giving rise to this action have occurred and/or will occur in this District and Defendants reside in this District.

## IV.
## CLASS ACTION ALLEGATIONS

13.     Plaintiff is representative of a Class of persons and entities who produced finished carbon steel ASTM A105 flanges sold in the U.S. between May 5, 2013, and May 31, 2019.

## A.     RULE 23(A) PREREQUISITES

14.     To certify a class under FED. R. CIV. P. 23, Plaintiff must satisfy each element of subsection (a), including:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

15.     Here, prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met. The Class includes between fifty (50) and seventy (70) or more flange producers. The members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder is also impracticable because of the geographic diversity of the members of the Class, as well as the modest nature of some Class members' individual claims, making individual pursuit of these claims cost-prohibitive and/or inefficient, and the need to expedite judicial relief.

16.     There are numerous questions of law and fact arising from Ulma's false advertising and unfair competition which are common to the members of the Class. These include, but are not limited to, common issues as to:

(a)     whether Ulma is collaterally and/or judicially estopped from contesting issues as to its liability for false advertising and unfair competition, as well as the amount of its unjust enrichment under a judgment of the court in the Boltex and Weldbend suit against Ulma, Case No. 4:17-cv-1400, entered on April 21, 2020, and which became final and non-appealable on July 8, 2020;

(b)     if not collaterally and/or judicially estopped, whether Ulma's admissions in the Boltex and Weldbend suit prove that Ulma is liable under § 43(a) of the Lanham Act for false advertising and unfair competition and under Texas common law for unfair competition; and

(c)     if not collaterally and/or judicially estopped and beyond its admissions in the Boltex and Weldbend suit, whether under common facts and evidence Ulma is liable under § 43(a) of the Lanham Act for false advertising and unfair competition and under Texas common law for unfair competition.

17.     The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. Ulma competes with Plaintiff and the Class in the U.S. market for the same sales of A105 carbon steel flanges to the same customers. The Class Representative and the members of the Class are similarly or

identically harmed by the same systematic and pervasive action.

18.    The Class Representative and its counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of the Class Representative and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the Representative's claims and those of the members of the Class.

## B.    RULE 23(B) PREREQUISITES

19.    In addition, the Class must satisfy one of the categories of subsection (b) of Rule 23:

(1)    prosecuting separate actions by or against individual class members would create a risk of:

(A)    inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B)    adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

20.     Here, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(1)(A) is appropriate because separate actions brought by individual class members against Ulma would create a risk of inconsistent or varying adjudications that could establish incompatible standards of conduct for Ulma.

21.     In addition, separate adjudications could, as a practical matter, be dispositive of the interests of absent class members, or otherwise impair or impede the ability of absent class members to protect their interests, making prosecution of the claims of the Class as a class action appropriate pursuant to Rule 23(b)(1)(B).

22.     In addition, or in the alternative, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(1)     The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(2)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

**V.**
**FACTUAL BACKGROUND**

**A.     A105 FLANGES ADVERTISED AS "NORMALIZED" MUST BE HEAT TREATED PURSUANT TO ASTM'S STANDARDS**

23.     Carbon steel flanges are critical components used in oil and gas pipelines, among many applications. The flanges are used to connect pipes to other pipes, valves, and fittings used in oil and gas pipelines.

24.     ASTM International (formerly, the American Society for Testing and Materials) ("ASTM") is an international organization that sets standards for, among other things, forged carbon steel flanges. One purpose of ASTM standards is to protect the public by requiring testing and requiring that components be manufactured by certain processes in order to reach a level of

performance and safety standards. Another is to provide uniform standards of quality for those purchasing and using flanges.

25.    ASTM Standard A105 covers forged carbon steel piping components, including flanges for ambient- and higher-temperatures services in pressure systems. Under ASTM Standard A105, heat treatment is mandatory for carbon steel flanges above Class 300. Even though it is not required by ASTM A105, many customers, including those in the oil and gas industry, require that flanges in the 150 and 300 pressure classes be normalized.

26.    "Normalization" is one of the heat treatment processes expressly permitted under ASTM A105. ASTM standards A961 and A941 define "normalizing" as a separate heat treatment process that takes place after forging but before machining, wherein material is placed in a furnace and uniformly reheated to a temperature above the transformation range and subsequently cooled in air at room temperature to achieve grain refinement and improved homogenization.

27.    Normalizing a carbon steel flange improves its physical properties, generally producing a more refined grain structure in the steel. Improving the physical properties of flanges through normalization is important, and mislabeling the qualities and characteristics of A105 flanges, which are used throughout the petroleum industry, is a dangerous practice.

28.    Normalizing steel requires equipment, suitable facilities, as well as significant additional energy, labor, and time. Because normalization is an additional process that consumes time and resources, performing normalization increases the manufacturer's cost to produce steel components, including flanges.

29.    Manufacturers, including Ulma, identify carbon steel flanges that comply with ASTM A105 standards and that have been normalized by marking (engraving) the flanges with "A105N." Ulma thus labels purportedly normalized flanges with an "N." ASTM requires that a

flange marked "A105N" or otherwise advertised and promoted as normalized must be normalized in accordance with ASTM standards.

**B.    ULMA COMPETES WITH PLAINTIFF AND THE CLASS IN THE U.S. MARKET FOR A105 FLANGES**

30.    Ulma, Plaintiff, and the Class produce and sell carbon steel flanges in the United States. Specifically, Ulma competes with Plaintiff and the Class in the U.S. market for A105 carbon steel flanges. Ulma's sale of flanges to customers directly impacts Plaintiff and the Class, depriving them of flange sales.

31.    Ulma, Plaintiff, and the Class primarily—and in many instances only—sell to distributors, who ultimately sell to end-users like Exxon, Chevron, and Phillips 66. Ulma, Plaintiff, and the Class are regularly included on the same Approved Manufacturer Lists ("AML")—that is, a pre-approved list of flange manufacturers maintained by end-users and distributors, from whom A105 carbon steel flanges are often (though not exclusively) purchased.

32.    Ulma, Plaintiff, and the Class often market flanges via responses to requests for quotes ("RFQ"). Through an RFQ, distributors contact vendors like Ulma, Plaintiff, and the Class to buy flanges meeting certain specifications. Customers receiving competing responses to RFQs will purchase the flanges meeting the specified requirements that are offered at the most competitive price and terms. When an RFQ specifies an ASTM standard, the product sold must comply with that ASTM standard.

33.    Flange customers consider flanges that meet ASTM A105 to be fungible. Many buyers—including pipeline companies—accept both foreign and domestic flanges for many jobs. In 2016, the United States International Trade Commission ("ITC") found in an anti-dumping proceeding against Spanish flange manufacturers that Ulma and domestic flange companies "compete in the same segments of the market to a significant degree." ITC Publ'n 4696 (June

2016). In ruling against Ulma, the ITC found that Ulma's carbon steel flanges are "interchangeable" for flanges offered by other flange companies, and that "domestically produced flanges and flanges imported from the subject sources are highly substitutable when sold based on AML requirements, and also highly substitutable when AML designation is not required."

34.     In 2016, Iosu Bastida wrote an internal memo discussing Ulma's competition in the U.S. flange market. Echoing the ITC's conclusions, he wrote that: "Domestically produced flanges and flanges imported [sic] are highly substitutable when sold based on AML requirements and also highly substitutable when AML designation is not required." Notwithstanding the ITC's imposition of anti-dumping duty on Ulma, Mr. Bastida confirmed: "we are still on [sic] the market place competing against" domestic flange companies. Mr. Bastida also observed that Ulma sells its flanges "in all geographic markets in the United States," using "the same channels of distribution, primarily to distributors," as domestic companies.

## C.    ULMA ADVERTISED AND PROMOTED ALL OF ITS A105 FLANGES AS "NORMALIZED" AND ASTM-COMPLIANT

35.     For many years, Ulma has explicitly advertised **all** of the carbon steel A105 flanges it produces and sells into the United States as normalized and compliant with ASTM A105. Ulma does so in its promotional materials, including, for example, in brochures and presentations Ulma provides to actual and potential customers. Ulma also hosts tours of its manufacturing plant, showing these customers how it supposedly normalizes all of its A105 flanges consistent with ASTM's standards.

36.     Ulma also advertises and promotes its A105 flanges as "normalized" through its email communications to actual and potential customers, and by responding to customer RFQs that it is offering normalized flanges that comply with ASTM A105.

37.     Ulma further advertises and promotes all of its carbon steel A105 flanges as

"normalized" by marking the flanges themselves as "A105N," meaning that they are normalized and ASTM-complaint. Similarly, in its Certificates of Inspection (also called Material Test Reports ("MTRs")), Ulma certifies its flanges as "A105N." In those same documents Ulma even describes the normalization process it purportedly employs, claiming that its flanges are "NORMALIZED AT 900 C AND ALLOWED TO COOL IN STILL AIR."

## D.    ULMA'S ADVERTISING WAS LITERALLY FALSE, INTENTIONALLY DECEPTIVE, AND MATERIAL

38.    Flange producers, including Plaintiff and the Class, only label, advertise, and sell an A105 flange as "normalized" if it in fact has been normalized in compliance with ASTM standards. By contrast, Ulma's labeling and advertising was literally false. As Judge Hanen found, "at least 95% of the flanges Ulma advertised and sold into the United States which purported to be normalized and ASTM-compliant were not normalized in compliance with the ASTM standards. Thus, most of their advertising was false."

39.    Ulma did not subject these flanges to a separate heat treatment process whereby the flanges were uniformly reheated to a temperature above the upper transformation temperature, held at the temperature, and subsequently allowed to air cool. In short, as Judge Hanen found, "Ulma never normalized their flanges in the manner required by the ASTM standards, despite the fact that they advertised that their flanges complied with these standards." Ulma merely sold as-forged, non-normalized flanges as "normalized."

40.    Ulma's advertising and promotions were intentionally deceptive. Ulma knew it had to heat treat its flanges pursuant to ASTM standards in order to truthfully mark those flanges "A105N." Ulma's internal "Procedure for Normalizing" describes "proper heat treatment for normalizing of ASTM A105" material and states that the procedure is "subject to corresponding ASTM A941."

41.     Ulma further knew that complying with ASTM standards was important to its customers. Customers expect that A105 flanges that are required to be normalized and/or that are marked as normalized will be normalized according to ASTM standards A961 and A941. If an A105 flange does not meet ASTM A105's standards, a distributor will neither purchase nor sell the flange to an end user, and the customer will reject or return such a shipment.

42.     But customers who receive a flange marked or certified as "Al05N" or "normalized" have no easy, non-destructive, means of verifying whether the flange was actually heat treated. Instead, customers must rely on the manufacturers' representations that they normalized their flanges. Ulma preyed on that trust.

43.     Ulma's false and misleading representations were material. Normalization is an important feature of carbon steel flanges. "Normalized" flanges also are more expensive than comparable flanges sold "as forged," that is, non-normalized. Thus, if a customer purchases a flange described as normalized, meeting ASTM A105, and/or as "A105N," it is because the customer's application requires a flange having those qualities.

44.     Ulma's claim to normalize all its flanges, even when not required by ASTM A105, represented a key selling point. Ulma sold its purportedly "normalized" ASTM A105 flanges at a price equal to or less than the price at which Plaintiff and the Class sold their ASTM A105-compliant flanges. Ulma was able to undercut Plaintiff and other members of the Class on price because it dodged the additional cost of normalizing its flanges.

45.     Ulma's false and misleading advertisements and promotions actually deceived customers. Customers relied on Ulma's RFQ responses that it would supply normalized and ASTM-compliant flanges. In addition, customers also rely on shipment specific documentation, including flange markings and MTRs that accompany each shipment, in finalizing purchases.

Distributors inspect flange shipments upon receiving them to confirm that the flanges satisfy the RFQ and/or purchase order specifications. If the flange markings and shipment documents do not match these requirements, including normalization and/or ASTM-compliance, the shipment will be rejected and the purchase will not be concluded.

46.     If customers who purchased Ulma's purportedly "normalized" carbon steel flanges knew that the flanges were not, in fact, normalized and/or that Ulma did not comply with the heat treatment requirements of ASTM A105, these customers would not have purchased Ulma's flanges, and instead would have purchased A105 flanges from the Plaintiff and the Class.

47.     Because of the difference in price, and a belief that Ulma's flanges were of the same quality and met the same standards as Plaintiff's and the Class's flanges, customers in the State of Texas and across the country that required normalized flanges compliant with ASTM A105 purchased Ulma's flanges instead of Plaintiff's and the Class's A105 flanges. Customers that purchased Ulma's purportedly normalized flanges believed from Ulma's advertising and promotion that they were getting a bargain by purchasing what they believed was a premium "normalized" flange at no additional cost than an as-forged flange.

**E.     ULMA CONTINUED, AND INTENTIONALLY CONCEALED, ITS FALSE AND MISLEADING ADVERTISING AND PROMOTIONS AND UNFAIR COMPETITION EVEN AFTER BEING SUED**

48.     For decades, Ulma concealed its false advertising. Thus, it falsely represented that it normalized all of its A105 flanges whenever asked by a customer.

49.     Even after Boltex and Weldbend sued Ulma for false advertising in May 2017, Ulma continued to falsely advertise its flanges as normalized and compliant with the ASTM standards when they were not.

50.     In May 2017, when Boltex and Weldbend brought their suit, Ulma knew that only a very small percentage of the A105 flanges it had marked and sold as normalized had actually

been normalized. Ulma could have provided fully accurate information about its processes to customers before this time, but it did not.

51.    Instead, Ulma's executive team, including its Managing Director and its CFO, along with Ulma Forja's Board of Directors, decided to continue falsely advertising, promoting, and selling non-normalized flanges as "normalized" after May 5, 2017. Thus, Ulma continued to market and sell non-normalized flanges as "normalized" and "A105N" to customers in 2018 and 2019.

52.    In May 2017, after Boltex and Weldbend filed their suit, Ulma sent a letter to all of its customers accusing **Boltex and Weldbend** of unfair competition by purportedly lying about Ulma's failure to normalize. Ulma reiterated the false claim that it in fact normalized all of its flanges in compliance with ASTM standards, and promised that Ulma would "prove the allegations" that it did not normalize its flanges "to be false." Ulma's CEO, Jesus Urien, admitted that Ulma wanted customers to rely on this letter. In separate correspondence with a distributor, Ulma dismissed customers' concerns about the suit and the issue of normalization as "stupid" and "crazy."

53.    At trial in the Boltex and Weldbend suit, Iosu Bastida, Ulma's North American Office Director, acknowledged that Ulma's May 2017 letter was incorrect and that Ulma knew that it was not normalizing its flanges consistent with the ASTM standards when it sent the letter refuting the allegations in this suit and accusing Boltex and Weldbend of lying. When pressed as to why the company made these false statements when confronted with the lawsuit, Bastida could only say that Ulma "should have been more accurate." But Ulma's claims were not merely inaccurate; Ulma admitted that at least 95% of the flanges it had advertised as "normalized" before the letter went out had never been heat-treated at all.

54.    Ulma admitted it continued to sell non-normalized flanges as "normalized" into 2019. Starting at the end of December 2018—that is, *after* discovery had closed in the Boltex and

Weldbend suit—Ulma privately told some customers that "in the past, ULMA utilized two alternative kinds of normalization processes for carbon steel A105 flanges":

> (1)    The process prescribed under ASTM A961; and

> (2)    ULMA's in-line normalization process.

This second "process," which purportedly involved superior steel, a lower forging temperature, and slower cooling, did not involve heat treatment, and was not a *process* at all.

55.    Made-up as part of Ulma's litigation response, this supposed "in-line" normalization process was merely Ulma's standard forging process. Because it did not involve heat treatment, the "in-line" process was not compliant with ASTM A961 or ASTM A941.

56.    In fact, Ulma's forging process did not employ a lower forging temperature or slower cooling than did other manufacturers. Ulma also did not consistently use a superior "engineered" steel. Ulma used several types of steel for its non-normalized ASTM A105 flanges, much of which was of mediocre, "very plain" quality. Indeed, in September 2014, Ulma Forja's leadership, including its then-managing director, Asier Oyarbide, discussed a customer's complaints about a failed Ulma flange. Although testing demonstrated that "**the cause of the defect is the raw material**," (emphasis in original), Ulma recognized that: "If we tell the truth to the customer, then "[a]ll material supplied with such castings could be refused" and "the repercussions could be very serious." Mr. Oyarbide concluded that while "the subject [was] critical enough," "we cannot tell" the customer, and instead directed Ulma's leadership to lie:

> I'd say in some way it has been a F***-up from the forge. That the shear has folded or created ripples, or . . . a 'usual' reason using a little imagination."

(from translation) (ellipses in original, profanity altered).

57.    Nor is there meaningful evidence that Ulma *ever* began normalizing all of its A105 flanges advertised and promoted as normalized. For example, in April 2020, third party engineers

reported that they had tested the toughness of Ulma flanges in late 2019, and rejected several based on test results that were significantly outside the testing acceptance criteria. Moreover, Ulma does not have heat treatment records for flanges manufactured between May 2017 and (at least) May 2019, despite internal written procedures that require the company to generate and retain documentation of heat treatments. As Ulma's CFO explained, procedures that are "not documented [are] not done."

## F.    ULMA ALREADY WAS FOUND LIABLE FOR FALSE ADVERTISING AND UNFAIR COMPETITION

58.    On September 27, 2019, the jury in the Boltex and Ulma case against Ulma returned a unanimous verdict against Ulma on all claims, including false advertising and unfair competition under the Lanham Act and unfair competition under Texas common law, and found by clear and convincing evidence that Ulma's conduct was malicious or constituted fraud. Jury Verdict (Dkt. 296), Case No. 4:17-cv-1400.

59.    In Case No. 4:17-cv-1400, Judge Hanen found that Ulma knew it was providing false information to customers, and that Ulma intended to deceive customers by mislabeling its flanges. Judge Hanen also found that Ulma failed to stop falsely advertising its flanges even after Boltex and Weldbend filed their suit against Ulma. Instead, Ulma continued to intentionally falsely advertise its non-normalized flanges as normalized after 2017. Judge Hanen also found "ample evidence of malice in Ulma's conduct."

60.    On February 7, 2020, Judge Hanen issued a permanent injunction against Ulma, finding that:

> Mislabeling the qualities and characteristics of a product, like the flanges in question, which are used throughout the petroleum industry, is a dangerous practice. The evidence demonstrates that distributors and end users rely on this labelling as the only other way to make sure the products meet specifications is destructive testing. Accurate labeling, marketing, and advertising is essential. Even when used in settings that are not fraught with danger, accurate advertising and

labeling is obviously a benefit to the public. While the Court recognizes that there is space in the sales industry for puffery, Defendants' representations that their flanges complied with the heat treatment process provided by the ASTM standards at issue go well beyond that. The public deserves truthful product information especially on products as critical as these flanges potentially are, and therefore the Court finds that an injunction benefits the public interest.

Dkt. 365, Case No. 4:17-cv-1400.

61.    Finding that "false advertising in this industry is difficult to detect," and therefore "the buyers of the flanges must rely on the labeling," Judge Hanen further found against Ulma that its "false advertising here relates to the integrity of pipelines carrying oil and gas. Should a flange crack, it could result in leaks that severely harm the environment or cause damage to life or property."

62.    Consistent with Judge Hanen's findings, Ulma's ASTM A105 flanges in fact have experienced failures in the field associated with Ulma's failure to normalize. For example, in May 2018, an Ulma 16" 600 lb. A105N weld neck flange cracked and failed while in operation at a Phillips 66 refinery. Phillips 66's investigation determined "**that the stresses impose[d] during start up would not have led to cracking of a flange meeting the requirements of the ASME code,**" (emphasis in original), and that the microstructure of the Ulma A105 flange—which Ulma had advertised and sold as "normalized"—in fact "was not consistent with a normalizing heat treatment having been applied." Phillips 66's "[m]etallurgical tests indicate that the [Ulma] flange has not had the Normalising heat treatment as indicated on the material test certificate," and thus "was found to have" "Inadequate heat treatment" and "Very poor fracture toughness." Nevertheless, Ulma falsely claimed in commercial advertising and promotions that it has "supplied millions of carbon steel flanges to the market over several decades and there has never been a mechanical failure in the field due to our normalization processes."

63.    Ulma admitted that between May 2013 and the end of May 2019, it sold

approximately $130 million in A105 flanges to customers in the United States. The jury in the Boltex and Weldbend case found that Ulma gained $26 million in profits from its false advertising and unfair competition during that same time period. Case No. 4:17-cv-1400, Jury Verdict at Question 17(b) (Dkt. 296). The jury's verdict awarded Boltex and Weldbend disgorgement of that $26 million in Ulma's ill-gotten profits.

64.    Judge Hanen adopted the jury's findings, and also found "that disgorgement is an appropriate remedy that should be applied." Judge Hanen held that "the jury found that disgorgement was appropriate and found that Ulma Piping gained $26,000,000.00 from its false advertising and unfair competition from May 5, 2013 to May 31, 2019. The Court finds that the jury's behavior was in fact model behavior and their dedication to their civic duty commendable, especially when one considers that they served during a lingering tropical storm. More importantly for this order, the Court finds their results to be sound and quite supportable by the evidence."

## G.    THE COURT RESERVED OVER $20 MILLION OF ULMA'S UNJUST ENRICHMENT PROFITS FOR OTHER INJURED COMPETITORS

65.    Instead of awarding Boltex and Weldbend the entire amount of Ulma's ill-gotten profits, Judge Hanen reserved over $20 million in Ulma's unjust enrichment profits for other injured competitors. Judge Hanen found that: "In the disgorgement damage question, the jury was asked to find the total amount of profits Ulma derived from its misconduct, not an appropriate number to award Plaintiffs. The Court finds that profit figure to be both reasonable and supported by the evidence, and the Court adopts the same. ***This profit, however, was gained at the expense of all competitors in the flange marketplace, not just the Plaintiffs***." (emphasis added).

66.    In the Boltex and Weldbend case against Ulma, "The Court ha[d] only two of the many flange competitors before it." But Judge Hanen found that in "***the harm the Lanham Act addresses is one shared by all competitors in the market-the encroachment on the ability to***

*compete in a fair market*." (emphasis added). Thus, "*a disgorgement award shared between all competitors in the market* may serve the Lanham Act's purpose of achieving equity between or among the parties." (quotations and brackets omitted).

67.    Judge Hanen further found that, but for Ulma's false advertising and unfair competition, "Ulma's share of the market would be divided up among the remaining market participants, with the Plaintiffs receiving sales according to their market share." Judge Hanen thus "adjust[ed] the award to Plaintiffs herein [Boltex and Weldbend] to be consistent with the market shares of the entire carbon steel flange market," that is, 11.6% for Boltex and 10.4% for Weldbend. Thus, for Boltex, who held a 11.6% market share, the Court found $3,016,000.00 in disgorgement to be added to their own lost profits and costs. Ulma thus retained 78%—over $20 million—-of the $26 million false advertising and unfair competition profits.

68.    Judge Hanen's ruling adopted Ulma's own argument. In Ulma's Memorandum of Law in Support of Their Proposed Findings of Fact and Conclusions of Law, publicly filed by Ulma as Dkt. 368-7 in Case No. 4:17-cv-1400, Ulma argued that Boltex and Weldbend "participated in the flange market at certain determinable percentages, both in the 'real' world and in the 'but for' world in which Ulma's diverted sales were redistributed to the remaining market participants." Ulma thus successfully argued that Judge Hanen should "apply[] each Plaintiff's 'but for' market share percentage (10.9% for Weldbend and 12.1% for Boltex)" to arrive at a reduced disgorgement award. In other words, Ulma has admitted that damages for Plaintiff and members of the Class can be easily calculated based on the "determinable percentages" of each competitor's market share, thus obviating the need for individualized causation and damages inquiries and making this case particularly well-suited to adjudication on a classwide basis.

**VI.**
**ULMA IS COLLATERALLY AND JUDICIALLY ESTOPPED FROM CHALLENGING LIABILITY AND THE PLAINTIFF'S AND THE CLASS'S ENTITLEMENT TO $20 MILLION IN DISGORGEMENT**

69.     Ulma is liable to Plaintiff and the Class for false advertising and unfair competition under Section 43(a) of the Lanham Act because, as the jury in the Boltex and Weldbend trial already found, (a) Ulma's advertising claims that its A105 flanges were normalized and satisfied the standards of ASTM A105 were literally false or misleading statements of fact; (b) Ulma's statements actually deceived or had a tendency to deceive a substantial segment of potential consumers; (c) Ulma's deception was material, meaning it was likely to influence the purchasing decision; (d) Ulma's products were sold in or affected interstate commerce; and (e) Ulma's competitors were injured or likely to be injured as a result. Jury Verdict, Case No. 4:17-cv-1400.

70.     Ulma is liable to Plaintiff and the Class for unfair competition under Texas common law because, as the jury in the Boltex and Weldbend trial already found, (a) Ulma committed an underlying substantive tort or other illegal conduct; and (b) Ulma Piping's conduct interfered with its competitors' ability to conduct their business.

71.     Under principles of collateral estoppel, the judgment and holdings against Ulma in Case No. 4:17-cv-1400 are binding against Ulma in the present action. Collateral estoppel has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or its privy and of promoting judicial economy by preventing needless litigation. Non-mutual, offensive collateral estoppel precludes relitigation by Ulma because:

(1)     the issues in this case are identical to that litigated in the prior action;

(2)     the issues were fully and vigorously litigated in the prior action;

(3)     the issues were necessary to support the judgment in the prior case; and

(4)    there is no special circumstance that would make it unfair to apply
the doctrine.

72.    Here, the identical issues of Ulma's liability for false advertising and unfair
competition in its long-term scheme of marketing and promoting non-normalized, non-ASTM-
compliant flanges as "normalized" and compliant with ASTM standards were fully and vigorously
litigated in Case No. 4:17-v-1400. Ulma's vigorous defense of the claims against it is reflected in
the length of the docket in that case—which was brought in May 2017, resolved in July 2020, and
entailed more than *four hundred entries*—and the length of the jury trial, which ran from
September 16, 2019, until the entry of the jury's verdict in favor of Plaintiffs on all claims on
September 27, 2019.

73.    The issues resolved against Ulma were necessary to the final judgment against it,
and there are no "special circumstances" weighing against application of the doctrine. To the
contrary; Ulma's misconduct was extraordinary. To save costs, Ulma did the unthinkable: it
willingly lied to an entire industry regarding a key feature of a critical component of oil and gas
pipeline infrastructure, to the injury of all honest competitors.

74.    By the time of Ulma's incomplete admission in December 2018 that it was not
normalizing all of its A105N flanges pursuant to ASTM standards, it would have been impossible
or impractical for any other party to join the Boltex and Weldbend suit, much less a *class* of
plaintiffs. Indeed, the suit alleged astonishing misconduct; wrong-doing that Ulma also
vehemently denied, both in public advertising, communications with its customers, and in the
Boltex and Weldbend litigation, claiming that it was Boltex and Weldbend who were lying, and
promising to prove that the suit's allegations were wrong.

75.    To further its concealment, Ulma used the Consent Protective Order (Dkt. 89) in
the Boltex and Weldbend case aggressively, keeping information about its wrong-doing from the

public—including the Plaintiff and prospective class members in this case. Only after the close of discovery did Ulma admit—privately to some of its customers—that it had not in fact normalized its flanges per ASTM standards. And even then, Ulma continued to dissemble, claiming it had actually achieved normalization using an "in-line" process, and again used the protective order to keep this "admission" secret, and thus continued to hide the scope of its wrongdoing.

76.    In addition to being collaterally estopped from challenging its liability, after successfully advocating that the court should reduce the disgorgement award in Case No. 4:17-cv-1400 based on the market share of Boltex and Weldbend, Ulma is judicially estopped from advocating for a different outcome in this case. The doctrine of judicial estoppel protects the integrity of the judicial process, and has three elements:

(1)    the party against whom estoppel is sought has asserted a position plainly inconsistent with a prior position,

(2)    a court accepted the prior position, and

(3)    the party did not act inadvertently.

77.    Each of these elements is met: Ulma took an express position that disgorgement should be limited to market share percentage, Judge Hanen accepted this argument, and Ulma did not act inadvertently. Further, given that Ulma had a full and fair opportunity to litigate all pertinent liability issues regarding its improper conduct toward the entire industry, and given the inequitable nature of Ulma's conduct toward the industry, Ulma would not be prejudiced from having this issue (and all other issues set forth in this Complaint) resolved on a class-wide basis for the same time period adjudicated in the Boltex and Weldbend case, and Ulma has no viable defense to the adjudication of these claims in such a manner.

## COUNT I
## FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

78.    Plaintiff refers to and incorporates the allegations of the preceding paragraphs as though fully set forth herein.

79.    Defendants advertised, promoted, distributed, and sold purportedly normalized and ASTM A105-compliant flanges throughout the United States and Texas to distributors, customers and others, for use in the oil and gas, petrochemical, transmission, engineering, construction, and other industries.

80.    Defendants advertised, promoted, distributed, and sold their purported "normalized" flanges by making false and misleading statements in advertising and promotions, including through:

> (a)    brochures and presentations Ulma provided to actual and potential customers;
> (b)    email communications to actual and potential customers;
> (c)    responses to customer RFQs;
> (d)    engravings (markings) on the flanges themselves;
> (e)    signed certificates of inspection, and
> (f)    MTRs,

to create the false impression that the Defendants' flanges are normalized and that they meet the specifications of ASTM A105.

81.    Defendants' promotional claims about their flanges were literally and/or impliedly false and misleading. Defendants' flanges had not been normalized, they did not exhibit the characteristics of normalized flanges, and they did not meet the specifications of ASTM A105.

82.    Defendants' promotional claims violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides in relevant part that

> any person who, on or in connection with any goods or services, . . . uses in commerce any . . . false or misleading description of fact or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or

her or another person's goods, services, or commercial activities, shall be liable to a civil action by any person who believes that he or she is likely to be damaged by such act.

83.    Additionally, Defendants are liable for false advertising under the Lanham Act because they intentionally induced and/or knew or had reason to know that distributors and other third parties who marketed and sold Defendants' flanges would falsely describe Defendants' flanges as "normalized" and compliant with ASTM A105, but continued to market and sell the products to those entities anyway.

84.    By reason of Defendants' conduct, Plaintiff and the Class suffered injury. Pursuant to 15 U.S.C. § 1117, Plaintiff and the Class are entitled to damages for Defendants' Lanham Act violations, including an accounting of profits made by Defendants on sales of their so-called "normalized" flanges, and recovery of Plaintiff's costs for this action.

85.    Defendants' acts were willful, wanton, and calculated to deceive, and were undertaken in bad faith, making this an exceptional case entitling Plaintiff and the Class to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

## COUNT II
## UNFAIR COMPETITION IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(a)

86.    Plaintiff refers to and incorporates the allegations of the preceding paragraphs as though fully set forth herein.

87.    Defendants marketed their carbon steel flanges as equivalent to the normalized, ASTM A105-compliant flanges manufactured, marketed and sold by Plaintiff and the Class. In doing so, Defendants deceived, misled, and confused distributors, customers, and others.

88.    Defendants' false and misleading description of their flanges as meeting the same standards and having the same characteristics as Plaintiff's and the Class' flanges caused confusion, mistake, or deception about the nature, characteristics, and qualities of Defendants'

flanges in comparison with Plaintiff's and the Class's flanges.

89.    Defendants knew, or in the exercise of reasonable discretion should have known, that their advertising would deceive distributors, customers, and others about the nature, characteristics, and qualities of Defendants' carbon steel flanges in comparison with equivalently described flanges advertised, marketed, and sold by Plaintiff and the Class.

90.    Defendants' conduct amounts to deception, trickery, and/or unfair methods, and damaged and jeopardized Plaintiff's and the Class's businesses. As a result of such malicious, wanton, and/or fraudulent conduct, Defendants caused consumer confusion as to the nature, characteristics, and qualities of Defendants' carbon steel flanges in comparison with equivalently described flanges advertised, marketed, and sold by Plaintiff and the Class.

91.    Defendants' acts constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides in relevant part that

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

92.    Additionally, Defendants are liable for unfair competition under the Lanham Act because they intentionally induced and/or knew or had reason to know that distributors and other third parties who market and sell Defendants' flanges would falsely describe Defendants' flanges as "normalized" and compliant with ASTM A105, but continued to market and sell the products to those entities anyway.

93.    By reason of Defendants' conduct, Plaintiff and the Class suffered injury. Pursuant to 15 U.S.C. § 1117, Plaintiff and the Class are entitled to damages for Defendants' Lanham Act

violations, an accounting of profits made by Defendants on sales of the falsely advertised flanges, and recovery of Plaintiff's costs for this action.

94.     Defendants' acts were willful, wanton, and calculated to deceive, and were undertaken in bad faith, making this an exceptional case entitling Plaintiff and the Class to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

<u>**COUNT III**</u>
**COMMON LAW UNFAIR COMPETITION**

95.     Plaintiff refers to and incorporates herein the allegations of the preceding paragraphs as though fully set forth herein.

96.     Defendants committed an underlying substantive tort or other illegal conduct. Specifically, Defendants have made false and misleading explicit and implicit representations of fact to distributors, customers, and others that their carbon steel flanges are normalized and that they meet the specifications of ASTM A105, and thus are equivalent to flanges marketed and sold by Plaintiff and the Class. In making these representations, Defendants have deceived, misled, and confused distributors, customers, end-users, and others. Defendants' false and misleading descriptions of their carbon steel flanges as "normalized" and compliant with ASTM A105 were likely to, and in fact did, cause confusion, mistake, or deception about the nature, characteristics, and qualities of their flanges in comparison with the Plaintiff's and the Class's carbon steel flanges.

97.     Defendants' conduct interfered with Plaintiff's and the Class's ability to conduct their business. Specifically, and as Defendants knew or in the exercise of reasonable discretion should have known, Defendants have caused consumer confusion as to the nature, characteristics, and qualities of their carbon steel flanges in comparison to Plaintiff's equivalently described flanges, and damage to Plaintiff's and the Class's businesses, reputations, and goodwill for which they are entitled to relief. Defendants' false advertising encouraged the sale and use of their carbon

steel flanges in place of Plaintiff's and the Class's equivalently described flanges, leading customers to purchase Defendants' falsely advertised, non-normalized A105 flanges instead of purchasing flanges from Plaintiff and the Class.

98.    Plaintiff and the Class are entitled to damages for Defendants' unfair competition, an accounting of profits made on sales of Defendants' falsely described flanges, and recovery of Plaintiff's costs of this action.

99.    In addition, Defendants' actions were willful, malicious, and undertaken with the purpose of deceiving customers. Because Defendants knew or should have known that their conduct was reasonably likely to result in injury, damage, or other harm, the award of punitive damages is warranted.

## VI.
## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that all issues be determined by jury.

## VII.
## PRAYER FOR RELIEF

Plaintiff prays for the following relief:

A.    An Order certifying the Class and designating the Plaintiff as class representative;

B.    A judgment and order that Defendants are collaterally estopped from challenging the judgment and findings against them in Case No. 4:17-cv-1400, including their liability for false advertising and unfair competition in violation of the Lanham Act, the finding that disgorgement of profits is an appropriate remedy for these violations, and that Defendants realized $26 million in profits from their false advertising and unfair competition;

C.    A judgment and order that Defendants are judicially estopped from taking a contrary position in this case from that which they successfully argued in Case No. 4:17-cv-1400, that their false advertising and unfair competition in violation of the Lanham Act injured all

competitors in the market for A105 flanges in the U.S., and that disgorgement of the $26 million Defendants realized as a result of their false advertising and unfair competition should be awarded to injured competitors on a pro rata basis as measured by market share;

      D.    A judgment and order requiring Defendants to pay Plaintiff and the Class damages in the amount of Plaintiff's and the Class's actual and consequential damages resulting from Defendants' false and misleading advertising and unfair competition pursuant to 15 U.S.C. § 1117(a);

      E.    A judgment and order finding that this is an exceptional case and requiring Defendants to pay Plaintiff and the Class additional damages equal to three times the actual damages awarded Plaintiff and the Class pursuant to 15 U.S.C. § 1117(a);

      F.    An order finding that Defendants acted maliciously, wantonly and/or fraudulently, requiring Defendants to pay Plaintiff the Class punitive damages pursuant to the common law of the State of Texas;

      G.    A judgment and order requiring Defendants to pay the costs of this action under 15 U.S.C. § 1117(a);

      H.    An accounting be directed to determine Defendants' profits resulting from their illegal activities and such profits be paid over to Plaintiff and the Class, increased as the Court finds to be just under the circumstances of this case pursuant to 15 U.S.C. § 1117(a);

      I.    A judgment and order requiring Defendants to pay Plaintiff and the Class pre-judgment and post-judgment interest on the damages awarded; and

      J.    Such other and further relief as the Court deems just and equitable.

Dated: December 21, 2020                    Respectfully submitted,

*s/Saul Perloff*

**Saul Perloff**
**Attorney-In-Charge**
Texas Bar No. 00795128
S.D. Texas Federal ID No. 20748
saul.perloff@nortonrosefulbright.com
**Katharyn Grant**
Texas Bar No 24050683
S.D. Texas Federal ID No. 641461
katharyn.grant@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Tel.    (210) 224-5575
Fax     (210) 270-7205

**Marc B. Collier**
Texas Bar No. 00792418
S.D. Federal ID No. 24057
marc.collier@nortonrosefulbright.com
**Peter Stokes**
Texas Bar No. 24028017
S.D. Texas Federal No. 29636
peter.stokes@nortonrosefulbright.com
**Robert L. Rouder**
Texas Bar No. 24037400
S.D. Texas Federal ID No. 3108753
robert.rouder@nortonrosefulbright.com
**NORTON ROSE FULBRIGHT US LLP**
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701-4255
Tel.    (512) 474-5201
Fax     (512) 536-4598

**Attorneys for Plaintiff**
**Ameriforge Corporation (doing business as**
**Coffer Corporation, Forged Vessel**
**Connections, and Texas Metal Works),on**
**behalf of itself and all others similarly**
**situated**